**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF GEORGIA
ALBANY DIVISION**

| | | |
|---|---|---|
| POST-CONFIRMATION COMMITTEE FOR SMALL LOANS, INC., | : | |
| | : | |
| Plaintiff, | : | CASE NO.: 1:13-CV-191 (WLS) |
| | : | |
| v. | : | |
| | : | |
| INNOVATE LOAN SERVICING CORPORATION, *et al.*, | : | |
| | : | |
| Defendants. | : | |

## ORDER

Pending before the Court are the Parties' Cross Motions for Summary Judgment (Docs. 43, 44) and Defendant Innovate Loan Servicing Corporation's Motions to Amend and for Oral Argument (Docs. 49, 54). For the reasons that follow, Plaintiff Post-Confirmation Committee for Small Loans, Inc.'s Motion for Summary Judgment (Doc. 44) is **GRANTED-IN-PART** and **DENIED-IN-PART**, Defendant's Motion for Summary Judgment (Doc. 43) is **DENIED,** and Defendant's Motion to Amend (Doc. 49) is **GRANTED.** Accordingly, Defendant's Motion for Oral Argument (Doc. 54) is **DENIED AS MOOT.**

## PROCEDURAL HISTORY

The Complaint in the above-captioned action was filed on December 10, 2013 (Doc. 1) and amended on February 26, 2014. (Doc. 9.) Defendant Innovate Loan Servicing Corporation answered the Amended Complaint on March 12, 2014 (Doc. 13) and amended its Answer on April 2, 2014 (Doc. 16), but Co-Defendant Best Buy Autos of Bainbridge, Inc. failed to appear in this case. The Court denied Plaintiff Post-Confirmation Committee for Small Loans, Inc.'s Motion for Default Judgment (Doc. 21) as to Co-Defendant on February

12, 2015 and ordered Plaintiff to refile its motion within thirty (30) days of the Court's order granting summary judgment in favor of or against Defendant.  (*See* Doc. 50 at 2.)

On January 30, 2015, the Court denied Defendant's Motion for Judgment on the Pleadings (Doc. 30) and found that Plaintiff sufficiently pled its actual and constructive fraudulent transfer claims under both Federal Rules of Civil Procedure 8(a) and 9(b).  (Doc. 42 at 3-5.)  The Court further found that the Amended Complaint did not establish enough factual matter for an *in pari delicto* defense to apply against Plaintiff on the face of the pleadings.  (*Id.* at 6.)

The Parties have filed their cross-motions for summary judgment as well as responses and replies thereto.  (*See* Docs. 43, 44, 51, 52, 59, 61.)  They have complied with M.D. Ga. L.R. 56 by attaching separate and concise statements of material fact along with responses thereto.[1]  (Docs. 43-1, 44-1, 52-1, 53.)  Defendant additionally moved to amend or correct its Motion for Summary Judgment by adding an additional exhibit for the Court's consideration (*see* Doc. 49) and moved for Oral Argument pursuant to M.D. Ga. L.R. 7.5.  (Doc. 54.)  Plaintiff filed a brief response to the Motion for Oral Argument and Defendant made its reply thereto.  (Docs. 56, 57.)  As such, the Court finds that the cross-motions for summary judgment and motion for oral argument are ripe for review.

## FACTUAL HISTORY

### I.  Introduction

The following facts are derived from the Complaint (Doc. 1), as amended (Doc. 9), the Amended Answer (Doc. 16), the Committee's Statement of Undisputed Material Facts and Responses (Docs. 44-1, 52-1), and Innovate's Statement of Undisputed Material Facts and Responses (Docs. 43-1, 53, 60), all of which were submitted in compliance with M.D. Ga. L.R. 56, and the record in this case.  Where relevant, the factual summary also contains undisputed and disputed facts derived from the pleadings, the discovery and disclosure materials on file, and any affidavits submitted, all of which are construed in a light most favorable to the nonmoving party.  *See* Fed. R. Civ. P. 56; *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986).

---

[1] Though not part of the Local Rule, Parties also submitted supplemental material facts.  (Docs. 52-1, 53, 60.)

## II. Relevant Facts

### A. The Parties

The Money Tree of Georgia, Inc. ("TMG"), Small Loans, Inc. ("SLI"), The Money Tree, Inc. ("TMT"), The Money Tree of Florida, Inc. ("TMF"), and The Money Tree of Louisiana, Inc. ("TML", collectively "the Debtors"), were engaged in the consumer finance business in Georgia, Alabama, Florida, and Louisiana, respectively. (Doc. 9 at ¶ 4.) The Debtors filed voluntary petitions for reorganization under Chapter 11 of the Bankruptcy Code on December 16, 2011, in the United States Bankruptcy Court for the Middle District of Alabama. (*Id.* at ¶ 5.)

Plaintiff Post-Confirmation Committee for Small Loans, Inc. ("the Committee") was formed pursuant to an Amended Joint Plan of Liquidation ("the Plan"), and has standing to bring any claims and causes of action held by the Debtors, their Affiliates and subsidiaries, and the Estates. (Docs. 9 at ¶ 5; 44-2 at 23.) The Plan specifically preserved claims against certain individuals and entities, including Defendant Innovate Loan Servicing, Corp. ("Innovate"). (Doc. 44-1 at ¶ 3.) Innovate is a Texas corporation with its principal place of business in Texas. (Doc. 9 at ¶ 6.) Innovate specializes in purchasing portfolios of automobile loans. (Doc. 44-1 at ¶ 4.)

Co-Defendant Best Buy Autos of Bainbridge, Inc. ("Best Buy") is a Georgia corporation and a wholly owned subsidiary of TMG. (Docs. 9 at ¶ 7; 43-1 at ¶ 3.) TMG was also a creditor of Best Buy from 2009 to 2011. (Doc. 44-1 at ¶ 28.) Best Buy was in the business of selling and financing automobiles to subprime borrowers. (Doc. 43-1 at ¶ 4.) Best Buy generated accounts receivable when it financed the purchase of automobiles by consumers, typically held the promissory notes, and collected the accounts in the ordinary course of its business. (Doc. 9 at ¶ 11.)

### B. The 2010 and 2011 Agreements

Best Buy and Innovate entered into a Purchase and Sale Agreement of Contracts on June 23, 2010 ("the 2010 Agreement") to which Best Buy assigned accounts to Innovate for a "Purchase Price" of at least $880,000 in exchange for $749,236. (Docs. 44-1 at ¶ 6; 53 at ¶ 6.) The sale price of the 2010 loans represented approximately 85% of the aggregate unpaid

principal balances plus accrued but unpaid interest due under the accounts.  (Doc. 43-1 at ¶ 19.)  The 2010 Accounts bore average interest rates in excess of 21%.  (Doc. 44-1 at ¶ 10.)  The 2010 Agreement also required Best Buy to repurchase accounts that were not paid by the initial borrowers or account debtors.  (*Id.* at ¶ 11.)  Best Buy guaranteed nine (9) monthly payments to Innovate under the repurchase obligation.  (*Id.* at ¶ 12.)  However, if any of the payments were not made, Innovate retained the right to "put back" the account or require Best Buy to repurchase the unpaid accounts.  (*Id.* at ¶ 13.)  As a result of the repurchase obligation, Best Buy paid $108,086 to repurchase accounts from Innovate.  (*Id.* at ¶ 14.)

Similarly to the 2010 Agreement, Best Buy and Innovate entered into Receivable Purchase and Sale Agreement (Limited Recourse) on December 14, 2011 ("the 2011 Agreement") to which Best Buy assigned accounts to Innovate for a "Payoff" balance of not less than $5,210,339.97 in exchange for $4,428,788.98.  (Docs. 44-1 at ¶ 17; 53 at ¶ 17.)  The sale price of the 2011 loans represented about 85% of the unpaid principal balance plus all accrued and unpaid interest and all accrued unpaid fees, charges, and the like of obligations owed under the accounts.  (Doc. 43-1 at ¶ 28.)  The 2011 Accounts bore average interest rates in excess of 19%.  (Doc. 44-1 at ¶ 18.)  The 2011 Agreement also required Best Buy to assume the same repurchase obligations, including Innovate's "put back" rights, in the event the accounts were not paid.  (*Id.* at ¶ 19, 23.)  Yet, unlike the 2010 Agreement, Best Buy guaranteed three (3) monthly payments, or six (6) biweekly payments, of the account debtors to Innovate.  (*Id.* at ¶ 22.)  Best Buy ultimately paid Innovate $474,184 to repurchase those unpaid accounts.  (*Id.* at ¶ 24.)

Bradley Bellville, former President of TMT, TMG, and Best Buy, approved of all material transactions on behalf of his respective organizations.  (Doc. 43-1 at ¶¶ 10-13.)  Along with Steve Morrison (Chief Financial Officer of TMT and TMG) [2] and Natasha Wood (former General Counsel for TMT, TMG, and Best Buy), Bellville participated in negotiations with Innovate to effectuate the 2010 and 2011 Agreements.  (*Id.* at ¶¶ 21, 30.)  Prior to execution, Bellville, Morrison, and Wood reviewed the terms and repurchase obligations of the

---

[2] Though Morrison was not an officer of Best Buy, he "handled all accounting functions for [Best Buy]." (Doc. 43-1 at ¶ 15.)  The corporate accounting staff for TMT also "handled all of the accounting and finance functions for [Best Buy], to include compiling financial statements for [Best Buy], preparing reconciliations for [Best Buy's] bank accounts, and other accounting duties."  (*Id.* at ¶ 5.)

Agreements. (*Id.* at ¶¶ 23, 31.) It is undisputed that Bellville, Morrison, and Wood all understood the terms of the 2010 Agreement and the effect of the repurchase obligations. (*Id.* at ¶ 25.) Bellville, Morrison, and Wood even compared the 2010 Agreement to the proposed 2011 Agreement prior to its execution. (*Id.* at ¶ 32.) Likewise, it is undisputed that Bellville and Morrison understood the terms of the 2011 Agreement. (*Id.* at ¶ 34.) Bellville and Morrison even considered a competing offer, but determined Innovate's offer was superior. (*Id.* at ¶ 35.) In each instance, neither Morrison nor Wood advised Bellville to not go through with the Agreements. (*Id.* at ¶¶ 24, 31.) Thus, Bellville gave his full consent and approval for Best Buy to enter into the 2010 and 2011 Agreements with Innovate. (*Id.* at ¶¶ 26, 36.)

At the time of the 2010 and 2011 Agreements, however, Best Buy was insolvent. (Doc. 44-1 at ¶ 29.) Innovate's Chief Financial Officer, Daniel Martinez, could not recall whether Innovate conducted a solvency analysis of Best Buy's financial circumstances prior to entering into these Agreements. (*Id.* at ¶ 21.) Best Buy also did not volunteer its "precarious financial position" to Innovate during negotiations. (Doc. 43-1 at ¶ 37.) Even though Best Buy never filed for bankruptcy, it paid TMG over $5.6 million to reduce Best Buy's intercompany obligation. (*Id.* at ¶¶ 39-40.) From September 25, 2009 to December 16, 2011, Best Buy reduced its intercompany debt from $22,692,351.31 to $17,050,061.42. (*Id.* at ¶ 40.)

### C. Expert Assessments of the 2010 and 2011 Agreements

Jerry L. Robinson, retail lending, accounting, and finance expert for the Committee, opined that Best Buy was not only "under distressed conditions that were not in the ordinary" for Buy Here Pay Here (BHPH) dealers like Best Buy, but Best Buy sold its account receivables on terms "significantly worse than market to Innovate." (Doc. 43-10 at 2.) While the market for BHPH dealers were "competitive and had adequate financial liquidity" in 2010 and 2011, Robinson stated that the 2010 nine-month and 2011 three-month repurchase provisions "caused the creditors of Best Buy to suffer additional cash losses as Best Buy was forced to provide additional replacement collateral to Innovate in excess of the market terms that could have otherwise been realized by Best Buy." (*Id.*) Robinson based

these conclusions on the Bellville deposition (*See* Docs. 46-1 to -7.), the "unusual" nine- and three-month recourse, buy-back term for "cherry-picked"[3] portfolios, and Innovate's failure to review Best Buy's poor financial condition prior to the transfers. (*Id.* at 4-5.)

In contrast, Steve Burke, long-time professional in the BHPH industry, rebutted the Robinson Report in a number of ways.  First, Burke rejected the opinion that Best Buy suffered cash losses due to providing replacement collateral to Innovate, because it is apparently common practice for BHPH dealers to repossess, resell, and/or refinance (called "Recycling") the same collateral that would have otherwise defaulted under Innovate or Best Buy.[4] (Doc. 43-11 at 6-7.)  In response to Robinson's statement that the terms of the 2010 and 2011 Agreements were "significantly worse than market," Burke contended that the 2010 and 2011 Accounts were actually purchased at an above market rate for the high risk of subprime loans.  (*Id.* at 9.)  With regard to the repurchase obligations, Burke stated that in his experience, "recourse is always part of the deal," and the nine- and three-month payment terms "were standard and customary for similar transactions."  (*Id.* at 12, 20.)

Innovate's Vice President of Risk Management, Preston Cecil, provided insight on how Innovate negotiates and prices their potential purchase of car loan portfolios.  (*See* Doc. 49-1.)  Innovate considers a range of factors, including the total remaining face value of the contracts sold, the average interest rate, the average credit score of an obligor, the size of the portfolio purchased, the reputation of the seller in the industry, and other intangible factors that effects Innovate's purchasing and pricing decisions.  (*Id.* at ¶ 5.)  Under this methodology, Cecil concluded that the 2010 and 2011 Agreements were not "negotiated and consummated in a distressed sale environment, and that all sales were negotiated at arm's length, in good faith, and for fair value."  (*Id.* at ¶ 10.)  As for the repurchase obligations, he found

---

[3] According to Jerry L. Robinson, "cherry picked" refers to loans of the "highest quality," while Steve Burke refers to the same term as loans that meet a company's underwriting guidelines and loss projections.  (Docs. 43-10 at 5; 43-11 at 12.)

[4] During S. Gregory Hays' tenure as Chapter 11 Trustee, he neither conducted nor was aware of any repossessions or other recoveries of collateral for loans that were subject to the 2010 and 2011 Agreements.  (Doc. 52-1 at ¶ 5.)  Natasha Woods was also unaware of any repossessions or recoveries that were subject to the Innovate transfers.  (*Id.* at ¶ 6.)  However, Bradley Bellville stated that Best Buy was able to replace the costs of buying back through Recycling.  (Doc. 43-5 at ¶ 9.)

similarly to Burke that the terms were "fair and based on customary and standard terms in the industry at the time." (*Id.* at ¶ 11.)

### D. Appointment of Hays and Termination of Bellville

S. Gregory Hays was appointed as Chapter 11 Trustee for the Debtors in May of 2011.[5] (Doc. 52-1 at ¶ 1.) Upon his appointment, Hays immediately terminated Bellville as president of TMT, TMG, and Best Buy "due to [Bellville's] malfeasance and incompetence," which included Bellville obtaining a $180,000 salary from Best Buy in August 2010, in addition to his $225,000 salary from TMT, without providing additional services to Best Buy or the Debtors. (*Id.* at ¶ 2, 3.) Bellville used the funds from the additional $180,000 salary to finance his purchase of TMT stock from the trust of W. Derek Martin. (*Id.* at ¶ 4.)

Hays was advised by Bellville that the purpose of the 2011 Agreement was to fund the necessary professional fees to allow the Debtors to reorganize under Chapter 11. (*Id.* at ¶ 8.) Hays believed that this purpose, the Innovate transfers, and the repurchase obligations resulting from the transfers were harmful to the creditors of Best Buy, including TMG. (*Id.* at ¶¶ 7-10.) Hays attempted to sell Best Buy's remaining assets during the Debtors' bankruptcy case. (*Id.* at ¶ 11.) Innovate and a co-bidder made an offer to buy Best Buy's remaining loans for $686,720, but the remaining loans had an aggregate principal amount of $7.7 million. (*Id.* at ¶ 12.) This offer was rejected, and the bankruptcy estate ultimately received less than $2 million for Best Buy's remaining assets. (*Id.* at ¶¶ 12-13.)

Almost exactly two years after the Debtors' petition for Chapter 11 reorganization, the Committee brought suit against Innovate and Best Buy in this Court on December 10, 2013. They seek to set aside the 2010 and 2011 Agreements under theories of constructive and actual fraudulent transfers pursuant to the Georgia Uniform Fraudulent Transfers Act (UFTA), O.C.G.A. 18-2-70, *et seq*.

---

[5] While Hays' Affidavit stated that he was appointed as Trustee on or about May 1, 2011, the Court recognizes that this might be an error since the Debtors' filed for Chapter 11 reorganization on December 16, 2011.

## STANDARDS OF REVIEW

### I. Federal Rule of Civil Procedure 56

Federal Rule of Civil Procedure 56 allows a party to move for summary judgment where no genuine issue of material fact remains and the party is entitled to judgment as a matter of law. "Summary judgment is appropriate if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *Maddox v. Stephens*, 727 F.3d 1109, 1118 (11th Cir. 2013). "A genuine issue of material fact does not exist unless there is sufficient evidence favoring the nonmoving party for a reasonable jury to return a verdict in its favor." *Chapman v. AI Transp.*, 229 F.3d 1012, 1023 (11th Cir. 2000) (en banc). "An issue of fact is 'material' if it is a legal element of the claim under the applicable substantive law which might affect the outcome of the case." *Allen v. Tyson Foods, Inc.*, 121 F.3d 642, 646 (11th Cir. 1997) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). "It is 'genuine' if the record taken as a whole could lead a rational trier of fact to find for the nonmoving party." *Tipton v. Bergrohr GMBH-Siegen*, 965 F.2d 994, 998 (11th Cir. 1992) (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)).

The movant bears the initial burden of showing, by reference to the record, that there is no genuine issue of material fact. *See Celotex*, 477 U.S. at 323; *Chapman*, 229 F.3d at 1023. The movant can meet this burden by presenting evidence showing that there is no genuine dispute of material fact, or by demonstrating to the district court that the nonmoving party has failed to present evidence in support of some element of its case on which it bears the ultimate burden of proof. *See Celotex*, 477 U.S. at 322-24. Once the movant has met its burden, the nonmoving party is required "to go beyond the pleadings" and identify "specific facts showing that there is a genuine issue for trial." *Id.* at 324. To avoid summary judgment, the nonmoving party "must do more than summarily deny the allegations or 'show that there is some metaphysical doubt as to the material facts.'" *Matsushita*, 475 U.S. at 586 (citations omitted). Instead, the nonmovant must point to competent record evidence that would be admissible at trial. *See also Jones v. UPS Ground*

*Freight*, 683 F.3d 1283, 1294 (11th Cir. 2012) (quoting *Macuba v. Deboer*, 193 F.3d 1316, 1322 (11th Cir. 1999)) (noting that hearsay may be considered on a motion for summary judgment only if it "could be reduced to admissible evidence at trial or reduced to admissible form."). Such evidence may include affidavits or declarations that are based on personal knowledge of the affiant or declarant.  *See* Fed. R. Civ. P. 56(c)(4).

On a motion for summary judgment, the Court must view all evidence and factual inferences drawn therefrom in the light most favorable to the nonmoving party and determine whether that evidence could reasonably sustain a jury verdict.  *See Celotex*, 477 U.S. at 322-23; *Allen*, 121 F.3d at 646.  However, the Court must grant summary judgment if there is no genuine issue of material fact and the movant is entitled to summary judgment as a matter of law.  Fed. R. Civ. P. 56(c).

## II. Local Rule 56

Local Rule 56 requires the following:
> The respondent to a motion for summary judgment shall attach to the response a separate and concise statement of material facts, numbered separately, to which the respondent contends there exists a genuine issue to be tried. Response shall be made to each of the movant's numbered material facts. All material facts contained in the moving party's statement which are not specifically controverted by the respondent in respondent's statement shall be deemed to have been admitted, unless otherwise inappropriate.

M.D. Ga. L.R. 56.  As stated above, the Parties complied with the Federal Rules of Civil Procedure and the Local Rules by filing timely cross-motions for summary judgment, responses and replies thereto, and attached a separate and concise statement of material facts.  The Court will now address these ripe motions.

### ANALYSIS

## I.   The Committee's Motion for Summary Judgment

The Committee contends it is entitled to summary judgment[6] on Counts I, III, and IV[7] of the Amended Complaint (Doc. 9), which raise allegations of constructive fraudulent

---

[6] The Court notes the Committee's desire to move for summary judgment against both Innovate and Best Buy in their single motion, but at this time the Court will address Innovate as the only responsive party in this action.

transfers, and all of Innovate's abundant affirmative defenses.  (*See* Doc. 16.)   For the reasons stated below, the Committee's Motion for Summary Judgment (Doc. 44) is **GRANTED-IN-PART** and **DENIED-IN-PART.**

### A. Constructive Fraud Claims

Under Georgia law, constructive fraudulent transfers will be set aside if the elements of O.C.G.A. § 18-2-75(a) are proven by a preponderance of the evidence.  *See* O.C.G.A. § 18-2-75(d).  O.C.G.A. § 18-2-75(a) provides,

> A transfer made or obligation incurred by a debtor is voidable as to a creditor whose claim arose before the transfer was made or the obligation was incurred if the debtor made the transfer or incurred the obligation without receiving a reasonably equivalent value in exchange for the transfer or obligation and the debtor was insolvent at that time or the debtor became insolvent as a result of the transfer or obligation.

O.C.G.A. § 18-2-75(a).  In order to prevail on a constructive fraudulent transfer claim, the plaintiff must establish (1) a prior claim against the defendant-debtor by the plaintiff-creditor, (2) the defendant-debtor did not receive a reasonably equivalent value in exchange for the transfer, and (3) the defendant-debtor was insolvent at the time of the transfer.  *CSX Transp. Inc. v, Leggett*, No. 1:07-CV-1152-WSD, 2010 WL 3210841, at *4 (N.D. Ga. Aug. 12, 2010) (citing *Kipperman v. Onex Corp.*, 411 B.R. 805, 834 (N.D. Ga. 2009)).  The Parties are not in dispute as to whether Best Buy was indebted to its parent-creditor TMG or whether TMG had a "claim" or right to payment from Best Buy prior to the transfers.  *See* O.C.G.A. § 18-2-71(3) (definition of "claim").  It is also undisputed that Best Buy was insolvent[8] at the time it entered into the 2010 and 2011 Agreements with Innovate.  (*See* Doc. 44-1 at ¶ 29.) Thus, the only question before the Court is whether Best Buy received a "reasonably equivalent value" in exchange for its transfers to Innovate.

Whether a debtor receives reasonably equivalent value, or "fair consideration," in exchange for the transfer is a question of fact "to which considerable latitude must be

---

[7] Though the Committee requested summary judgment on Count IV of the Amended Complaint (Doc. 9), the Court presumes the Committee meant Count V, and perhaps also Count VII, as Count IV is an actual fraudulent transfer claim.

[8] Under O.C.G.A. § 18-2-72(a), a debtor's insolvency is measured by "the sum of the debtor's debts [being] greater than the sum of the debtor's assets."

allowed to the trier of facts." *Nordberg v. Arab Banking Corp. (In re Chase & Sanborn Corp.)*, 904 F.2d 588, 593 (11th Cir. 1990) (interpreting 11 U.S.C. § 548).[9]  The Parties seem to disagree on which standard the Court should apply in determining reasonably equivalent value. (Docs. 44 at 11; 51 at 5-6; 61 at 5.)  The Committee, citing *Harman v. First Am. Bank of Md. (In re Jeffrey Bigelow Design Grp., Inc.)*, 956 F.2d 479 (4th Cir. 1992), suggests reasonably equivalent value should be evaluated from the creditor's perspective and focus on the net effect of the transfer on the debtor's estate.  *Id.* at 484.  Thus, if the creditors are "no worse off because of the debtor," then a reasonably equivalent value has been received.  *Id.*  In contrast, Innovate cites to *Crumpton v. Stephens (In re Northlake Foods, Inc.)*, 715 F.3d 1251 (11th Cir. 2013) and *Alexander v. Delong, Caldwell, Novotny & Bridgers, L.L.C. (In re Terry Mfg. Co., Inc.)*, No. 2:07-CV-620-WKW, 2008 WL 4493240 (M.D. Ala. Sept. 30, 2008), for the proposition that a transfer need not be set aside so long as the transfer conferred an "economic benefit" or Innovate paid for "roughly the value" of the transfer.  *In re Northlake Foods, Inc.*, 715 F.3d at 1255-56; *In re Terry Mfg. Co., Inc.*, 2008 WL 4493240 at *7 (recognizing "economic benefit" and "roughly the value" as less stringent standards).

The Court does not adopt the Committee's creditor-centered, net-effect approach to the reasonably equivalent value analysis, because the Court cannot look "with hindsight at a transaction because such an approach could transform fraudulent conveyance law into an insurance policy for creditors."  *Kipperman*, 411 B.R. at 837 (quoting *Daley v. Chang (In re Joy Recovery Tech. Corp.)*, 286 B.R. 54, 75 (Bankr. N.D. Ill. 2002)).  The Count does not also completely adopt Innovate's understanding of the reasonably equivalent value test.  While the Court cannot set aside transfers that confer an economic benefit to the debtor, *Gen. Elec. Credit Corp. of Tenn. v. Murphy (In re Rodriguez)*, 895 F.2d 725, 727 (11th Cir. 1990), that is only step one of the analysis.  "Assessing reasonably equivalent value in the context of fraudulent transfers involves a two-part test: (1) did Debtor receive any value whatsoever, whether in

---

[9] In construing Georgia's Uniform Fraudulent Transfers Act (UFTA), the Court finds it appropriate to consider similarly worded statutes under other statutory provisions, such as the Bankruptcy Code.  *See, e.g.*, *Kipperman v. Onex Corp.*, 411 B.R. 805, 828 (N.D. Ga. 2009) (analyzing "reasonably equivalent value" standard under both 11 U.S.C. § 548 and O.C.G.A. § 18-2-75); *Pettie v. Bonertz (In re LendXFinancial, LLC)*, No. 10-76803-MGD, 2012 WL 1597394, at *7 (Bankr. N.D. Ga. Mar. 19, 2012) (similarly analyzing Georgia's UFTA under 11 U.S.C. § 548 because the statutes "substantially mirror[]" one another).

the form of an indirect or direct benefit; and (2) was the value reasonably equivalent to the Property?" *Anderson v. Patel (In re Diplomat Constr., Inc.)*, No. 09-68613-MGD, 2013 WL 5591918, at *5 (Bankr. N.D. Ga. Aug. 6, 2013).

Based on the above, it is clear that Best Buy directly received something of value from Innovate. Under the 2010 Agreement, Best Buy received $749,326 in cash and an additional $4,428,788.98 under the 2011 Agreement. However, ultimately the question is whether what was received (here, cash) was reasonably equivalent to what was given away (here, Best Buy's accounts receivables). "In order to determine whether a debtor received 'reasonably equivalent value,' the court must look at what 'value' the debtor received in return for the transfer. The court must then determine whether the value received is reasonably equivalent; this will depend on the facts of each case." *Kipperman*, 411 B.R. at 837.

The Committee argues that Best Buy did not receive a reasonably equivalent value in the 2010 and 2011 Agreements due to the substantial discount Innovate received on high-interest subprime loans and the lengthy repurchase obligations for defaulted loans that ensured a profit for Innovate but a financial detriment to Best Buy. (Doc. 44 at 11.) While it is uncontested that the 2010 Accounts were valued at not less than $880,000 and the 2011 Accounts valued at not less than $5,210,339.97, assessing reasonably equivalent value does not require a "dollar-for-dollar exchange." *Advanced Telecomm. Network, Inc. v. Allen (In re Advanced Telecomm. Network, Inc.)*, 490 F.3d 1325, 1336 (11th Cir. 2007). Even with the discount, Innovate's expert reports and sworn affidavits create a factual dispute with regard to the value of the loans. Burke's report found that Best Buy sold the 2010 and 2011 Accounts at a "price higher than market value." (Doc. 43-11 at 9.) Furthermore, the Cecil Affidavit showed how Innovate approaches negotiations and pricing of car loan portfolios based on numerous tangible and intangible factors. (Doc. 49-1 at ¶ 5.) These critiques on the transfers at issue not only create a factual dispute, but they also show that reasonable jurors could disagree on whether the transfers were reasonably equal in value, even given the discounts on the high-interest loans.

With respect to the repurchase obligations, Burke and Cecil also similarly concluded that the repurchase obligations were common, customary, and standard in the BHPH industry.  (Docs. 43-11 at 12, 20; 49-1 at ¶ 11.)  The Committee argues that the repurchase obligations made it impossible for Best Buy to make a profit.  (Doc. 44 at 11.)  Best Buy paid $108,086 to repurchase defaulted accounts under the 2010 Agreement and $474,184 to repurchase defaulted accounts under the 2011 Agreement.  (Doc. 44-1 at ¶¶ 14, 24.)  However, the Bellville Affidavit stated that the repurchase obligations did not harm Best Buy because they were able to "Recycle" repossessed collateral and refinance it under a new loan.  (Doc. 43-5 at ¶ 9.)  Again, this creates a factual dispute on the issue of whether the repurchase obligations diminished the value of the transfer to make it less than a reasonably equivalent to what Best Buy received from Innovate.

Viewing this evidence in a light most favorably to Innovate, a reasonable jury could find that Best Buy received a reasonably equivalent value from Innovate under the 2010 and 2011 Agreements.  Above all, the "purpose of voiding transfers unsupported by 'reasonably equivalent value' is to protect creditors against the depletion of a bankrupt's estate."  *In re Rodriguez*, 895 F.2d at 727.  Because there is a genuine issue of material fact as to whether Best Buy received reasonably equivalent value under the 2010 and 2011 Agreements, the Court cannot fulfill the purpose of the voidance statute on motion for summary judgment.  Thus, the Committee's Motion for Summary Judgment on their constructive fraudulent transfer claims must be **DENIED.**

### B.  Affirmative Defenses

In their Response (Doc. 51), Innovate voluntarily released the following affirmative defenses initially raised in their Amended Answer (*see* Doc. 16):  (1) failure to state a claim, (2) jury trial, (3) judicial and equitable estoppel, (4) release, (5) waiver, (6) lack of standing, (7) simultaneous representation, (8) equitable subordination, and (9) characterization.  (Doc. 51 at 24.)  The Court will therefore accept Innovate's release and only address the remaining defenses, which are (1) arm's length dealings in the ordinary course of business, (2) good faith, (3) *in pari delicto*, and (4) setoff and recoupment.  Thus, the Committee's Motion for Summary Judgment on the released affirmative defenses is **DENIED AS MOOT.**

   *1. Arm's Length and In the Ordinary Course of Business*

     Though Innovate did not specifically preserve the defense of arm's length dealings "in the ordinary course of business or financial affairs and for reasonably equivalent value" (*See* Doc. 16 at ¶ 70), it also did not voluntarily withdraw it from the Court's consideration. The Committee argues that there is neither a legal nor factual basis for this defense.  (Doc. 44 at 14.)  Innovate provides no response to the Committee's argument.  Thus, the Court will presume and accept that Innovate concedes that there is no genuine issue of material fact that Innovate cannot raise a viable affirmative defense that the transfers were arm's length and in the ordinary course of business.  Additionally, the Court has not been pointed to any record evidence to support a contrary finding.  The Court will not, however, presume that Innovate concedes to the issue of reasonably equivalent value.  To that extent (*i.e.*, the defense of arm's length transfers made in the ordinary course of business or financial affairs), the Committee's Motion for Summary Judgment on this ground is **GRANTED.**

   *2. Good Faith and Reasonably Equivalent Value*

     Having already addressed the question of "reasonably equivalent value," the Court here will only address whether the Committee is entitled to summary judgment on the "good faith" affirmative defense with respect to its constructive fraudulent transfer claims.  While the Parties acknowledge that good faith is not an available affirmative defense for constructive fraudulent transfer claims (*See* Docs. 44 at 15-16; 51 at 21), Innovate argues that "good faith will afford the transferee protection on the amount that was given in the transfer."  (Doc. 51 at 21 (citing *In re Terry Mfg. Co., Inc.*, 2008 WL 4493240, at *7)). However, this is an argument of what a good-faith transferee is entitled to upon judgment. *See In re Terry Mfg., Inc.*, 2008 WL 4493240, at *7 ("'good faith' can enter the analysis of 'reasonably equivalent value' under the [Georgia] UFTA only *after* a transfer is considered fraudulent") (emphasis in original).  This is made explicit under the UFTA.  *See* O.C.G.A. § 18-2-78(d).  Thus, it is clear Innovate is not entitled to raise a good faith defense against the Committee's constructive fraudulent transfer claims at this stage of the litigation.

     However, Innovate correctly points out that the Committee offers no legal or factual grounds for granting summary judgment in the Committee's favor with respect to the actual

fraudulent transfer claims.  Under O.C.G.A. § 18-2-78(a), the good faith affirmative defense is a statutory defense for actual fraudulent transfer claims under O.C.G.A. § 18-2-74(a)(1). Because the Committee failed to carry its burden, the Committee's Motion for Summary Judgment as to Innovate's good faith affirmative defense is **DENIED.**

   *3.  In Pari Delicto*

   Georgia codified the *in pari delicto* defense at O.C.G.A. § 23-1-15, which states in pertinent part, "[w]hen both parties are equally at fault, equity will not interfere but will leave them where it finds them."   "The doctrine of *in pari delicto* is based on the policy that 'courts should not lend their good offices to mediating disputes among wrongdoers' and 'denying judicial relief to an admitted wrongdoer is an effective means of deterring illegality.'"  *Official Comm. of Unsecured Creditors of PSA, Inc. v. Edwards*, 437 F.3d 1145, 1152 (11th Cir. 2006) (quoting *Bateman Eichler, Hill Richards, Inc. v. Berner*, 472 U.S. 299, 306 (1985)).   The Committee makes several arguments for summary judgment in their favor with respect to Innovate's *in pari delicto* defense.[10]

   First, the Committee relies on the "adverse interest exception" to show that an *in pari delicto* defense is inappropriate when a corporate officer of Best Buy acts for their own benefit and to the detriment the company.  *See Cohen v. Morgan Schiff & Co., Inc. (In re Friedman's Inc.)*, 394 B.R. 623, 629 (S.D. Ga. 2008) (adverse interest exception "allows the company to recover, when the company's agents have acted entirely adverse to the company."). To support their reliance on this exception, the Committee contends that Bellville admitted to taking an additional salary as president of Best Buy from the funds of the 2010 Agreement.  (Doc. 44 at 16.)   However, Innovate is correct in that Bellville's deposition testimony cannot be construed in this manner.  While Bellville admitted to taking a $180,000 salary as President of Best Buy in August 2010, he never admitted that he took the salary from the proceeds of the June 2010 Agreement.  (*See* Doc. 46-1 at 40:11-42:17.) Thus, the Committee cannot rely on the adverse interest exception solely on this allegation.

---

[10] The Committee incorporates its previous arguments from its Response to Innovate's Motion for Judgment on the Pleadings.  (*See* Doc. 37.)

Next, the Committee asserts that an *in pari delicto* defense is inapplicable in a constructive fraudulent transfer action when the Committee is asserting a cause of action on behalf of a parent company against its subsidiary because TMG and Best Buy are separate entities.   (Docs. 37 at 7-8; 44 at 16.)    While "*in pari delicto* by agency" may not be a recognized defense, the Court has previously stated that the Committee "is acting on behalf of the Debtors," which includes TMG, and "all claims available to the Debtors, as well as all defenses applicable to those claims, are likewise available to the Committee and its claims." (Doc. 42 at 5).   Thus, Innovate may pursue an *in pari delicto* defense against TMG, by and through the Committee.

Finally, the Committee argues that *in pari delicto* does not apply to constructive fraudulent transfer actions because these types of offenses do not require wrongdoing. (Doc. 44 at 16.)   However, the Court cannot adopt the Committee's understanding of the defense, because the Georgia statute does not require "wrongdoing," but "fault."   *See* O.C.G.A. § 23-1-15.   Furthermore, *in pari delicto* is an equitable doctrine, "not a rigid formula which trammels the free and just exercise of discretion."   *In re Friedman's Inc.*, 394 B.R. at 631 (quoting *Johnson v. Yellow Cab Transit Co.*, 321 U.S. 383, 387 (1944)).   Even if the law applying *in pari delicto* to constructive fraudulent transfers is scant, this does not mean the doctrine is wholly inapplicable.   Thus, the Committee's Motion for Summary Judgment on Innovate's *in pari delicto* defense must be **DENIED.**

   *4.  Setoff and Recoupment*

The Committee cites O.C.G.A. § 13-7-3[11] for the proposition that Innovate has no viable setoff and recoupment defense against either the Committee or TMG because Innovate only engaged in business with Best Buy—not with the Committee or TMG.   (Doc. 44 at 13-14.)   Under this reasoning, the Committee argues that Innovate has no possible "claim or demand" against either the Committee or TMG.   (*Id.*)   As stated above, the Committee is equally empowered to bring claims available to Debtors against Innovate as Innovate is allowed to bring defenses against the Committee and the Debtors.   (*See* Doc. 42

---

[11] "Any claim or demand the defendant may have against the plaintiff may be used as a setoff, while only a claim or demand arising out of the same transaction as that sued on by the plaintiff may be used as a recoupment."   O.C.G.A. § 13-7-3.

at 5.)   The Plan provides that the Committee may "enforce all Causes of Action of the Debtors, their Affiliates and *subsidiaries*, and the Estates . . . ."  (Doc. 44-2 at 23) (emphasis added).   Thus, even if Innovate had no claim or demand against the Committee or TMG, the Committee concedes that Innovate would have a claim or demand against Best Buy, which is indisputably TMG's subsidiary.   Thus, summary judgment on the setoff and recoupment defense must be **DENIED.**   Furthermore, the Court agrees with Innovate in that setoff and recoupment defenses are more properly considered at the trial phase of this litigation.

## II.   Innovate's Motion for Summary Judgment

Innovate moves for summary judgment on all Counts of the Amended Complaint (*See* Doc. 9) and, in the alternative, moves for summary judgment on all Counts based on Innovate's good faith and reasonably equivalent value and *in pari delicto* affirmative defenses raised in its Amended Answer.  (*See* Doc. 16 at ¶¶ 70, 74, 76, 78.)  For the reasons stated below, Innovate's Motion for Summary Judgment (Doc. 43) is **DENIED.**

### A.   Actual Fraud Claims

In order to set aside an actual fraudulent transfer, the creditor-plaintiff must prove the elements of O.C.G.A. § 18-2-74(a) by a preponderance of the evidence.  *See* O.C.G.A. § 18-2-74(d).  Subsection (a)(1) states,

> (a) A transfer made or obligation incurred by a debtor is voidable as to a credi-
> tor, whether the creditor's claim arose before or after the transfer was made or
> the obligation was incurred, if the debtor made the transfer or incurred the
> obligation:
>
> (1) With actual intent to hinder, delay, or defraud any creditor of the debtor;

O.C.G.A. § 18-2-74(a)(1).  What separates actual and constructive fraudulent transfers is intent.  *See Truelove v. Buckley*, 733 S.E.2d 499, 502 (Ga. Ct. App. 2012).  "In order to prove that the relevant transfers were actually fraudulent, a plaintiff must show through direct evidence or various 'badges of fraud' that the relevant transfers 'were made with actual intent to hinder, delay, or defraud' the debtor's unsecured creditors."  *Kipperman*, 411 B.R. at 829 (quoting O.C.G.A. § 18-2-74(a)(1)).  Actual intent to hinder, delay, or defraud requires a

showing of debtor's manifest objective to prevent its creditors from enjoying a benefit rightfully owed to them. *See, e.g., Perkins v. Crown Fin., LLC (In re Int'l Mgmt. Assocs. LLC)*, No. A06-62966-PWB, 2007 WL 7141787, at *3 (Bankr. N.D. Ga. Mar. 7, 2007) (recognizing that the existence of a Ponzi scheme would sufficiently show debtor's actual intent to defraud).

The "badges of fraud" are eleven (11) enumerated considerations for determining actual intent under subsection (b) of O.C.G.A. § 18-2-74.[12] They are just as the statute states—considerations. However, these nonexclusive considerations enable creditor-plaintiffs with another way of showing actual intent on the part of the debtor-defendant they would not otherwise be able to prove. *See* UNIF. FRAUDULENT TRANSFER ACT § 4 cmt. 5, 7A U.L.A. 654 (2004) (proof of one or more of the factors indicate "relevant evidence as to the debtor's actual intent"). Yet, "proof of some, or even all, of the factors listed in the Fraudulent Transfer Act does not create a presumption of actual intent to defraud. Rather, those factors are indicators of such intent on which the trial court may rely to make its findings based on evidence presented by the parties." *Lindholm v. Holtz*, 581 N.E.2d 860, 864 (Ill. App. 2d 1991) (interpreting "badges of fraud" under the Illinois UFTA).[13]

---

[12] The eleven "badges of fraud" are as follows:
1. The transfer or obligation was to an insider;
2. The debtor retained possession or control of the property transferred after the transfer;
3. The transfer or obligation was disclosed or concealed;
4. Before the transfer was made or obligation was incurred, the debtor had been sued or threatened with suit;
5. The transfer was of substantially all the debtor's assets;
6. The debtor absconded;
7. The debtor removed or concealed assets;
8. The value of the consideration received by the debtor was reasonably equivalent to the value of the asset transferred or the amount of the obligation incurred;
9. The debtor was insolvent or became insolvent shortly after the transfer was made or the obligation was incurred;
10. The transfer occurred shortly before or shortly after a substantial debt was incurred; and
11. The debtor transferred the essential assets of the business to a lienor who transferred the assets to an insider of the debtor.

[13] The Court specifically notes that Georgia's "badges of fraud" provision under O.C.G.A. § 18-2-74(b) is the same as Illinois' "badges of fraud" provision under 740 Ill. Comp. Stat. 160/5. Because Georgia's UFTA is "modeled on the Uniform Fraudulent Transfer Act promulgated by the National Conference of Commissioners on Uniform State Laws and adopted in various forms by 43 states and the District of Columbia," *Bishop v. Patton*, 706 S.E.2d 634, 639 (Ga. 2011), disapproved on other grounds by *SRB Inv. Servs., LLLP v. Branch Banking and Tr. Co.*, 709 S.E.2d 267 (Ga. 2011), the Court finds it appropriate to consider case law out-

Innovate contends that Best Buy's intent is not in dispute because Bellville and Morrison both stated that the purpose of the 2010 and 2011 Agreements was to "upstream[] the proceeds from [Best Buy] to TMG, and TMG's parent, TMT."  (Doc. 43 at 10-11.) Additionally, Innovate argues that because the Committee only satisfied one of the eleven badges of fraud (Best Buy's insolvency) and failed to prove others (reasonably equivalent value and transfers constituting substantially all of Best Buy's assets), this cannot overcome Innovate's motion for summary judgment as a matter of law.  However, "[t]here is no magic formulation" when considering the badges of fraud.  *Kipperman v. Onex Corp.*, No. 1:05-CV-01242-JOF, 2010 WL 761227, at *4 (N.D. Ga. Mar. 2, 2010).  "One badge may be enough; many badges may not be enough."  *Id.*  This is to say that a court should treat these factors as considerations, rather than mere check marks on a list.  *Id.*

Furthermore, reasonable jurors could disagree upon the material disputed facts on the issue of Best Buy's intent.  With respect to the 2010 Agreement, Bellville's own deposition revealed that he took a substantial salary of $180,000 as president of Best Buy in August 2010, in addition to his $225,000 salary from the TMT, shortly after the June 23, 2010 transfer to Innovate.  (Docs. 44-1 at ¶ 27; 52-1 at ¶ 4.)  Bellville even stated that the purpose of taking the additional salary was to purchase TMT stock from the trust of W. Derek Martin.  (Doc. 52-1 ¶ 4.)  A jury could reasonably view that type behavior with suspicion and fraudulent intent because of the closeness in time between the $749,236 transfer in June and the taking of an additional salary of $180,000 in August and the surrounding circumstances.

With respect to the 2011 Agreement, Bellville advised Hays that the purpose of the 2011 Agreement was to fund and necessitate the Debtors' Chapter 11 reorganization filing. (Doc. 52-1 at ¶ 8.)  The Committee highlights in its Response that this type of activity raises a fact question as to Best Buy's intent to hinder or delay its creditors.  (Doc. 52 at 5.)  The Committee also notes Innovate's focus on Best Buy's intent to defraud rather than Best

---

side of its jurisdiction to determine matters under the UFTA.  *See, e.g.*, *Truelove v. Buckley*, 733 S.E.2d 499, 501 (Ga. Ct. App. 2012).

Buy's intent to hinder or delay.[14]  (*Id.*)  While Innovate argues that the filing of bankruptcy alone cannot be evidence of intent to hinder or delay, it may be considered in the larger inquiry of Best Buy's alleged fraudulent intent to hinder or delay its creditors.

Along with there being a genuine material fact question as to whether Best Buy received a reasonably equivalent value for the transfers made to Innovate, the Court finds there is enough here to create a genuine issue of material fact on Best Buy's intent.  Though these facts do not fit neatly within the eleven enumerated indicia of fraud, these are the type of facts that would be relevant to a jury in determining whether Best Buy acted with intent to hinder, delay, or defraud its creditors.  Thus, when construing the facts most favorably to the nonmoving party, Innovate's Motion for Summary Judgment on all actual fraudulent transfer claims must be **DENIED.**

### B. Constructive Fraud Claims

The Court incorporates it analysis from Section I(A) above.  Similar to the Committee's Motion for Summary Judgment on the constructive fraudulent transfer claims, Innovate's Motion for Summary Judgment must also be denied, because a genuine issue of material fact exists on the issue of reasonably equivalent value.  Innovate maintains that it is entitled to summary judgment because there is no genuine dispute that Best Buy received reasonably equivalent value in exchange for the 2010 and 2011 transfers.  Innovate also rests on its expert Burke Report and Cecil Affidavit discussed above and rejects the Committee's expert.

However, the Committee's expert, Jerry L. Robinson, found that Best Buy sold its account receivables on terms "significantly worse than market to Innovate."  (Doc. 43-10 at 2.)  Robinson specifically determined that the repurchase obligations were unusual terms and "caused the creditors of Best Buy to suffer additional cash losses . . . ."  (*Id.* at 2, 5.) Innovate points to the Bellville Affidavit, mentioned above, which stated that Best Buy was able to recoup any losses from the repurchase obligations because the company was able to

---

[14] Courts recognize that "the term 'defraud' does not subsume 'hinder or delay.'"  *Crews v. First Colony Life Ins. Co. (In re Barker)*, 168 B.R. 773, 778 (Bankr. M.D. Fla. June 3, 1994) (citing *NCNB Tex. Nat'l Bank v. Bowyer (In re Bowyer)*, 916 F.2d 1056, 1059 (5th Cir. 1990), rev'd on reh'g, 932 F.3d 1100 (5th Cir. 1991)).

"Recycle" those defaulted loans.  Yet, this is contrasted by the Affidavits of Hays and Woods, who stated they were unfamiliar with any repossession or recoveries that were subject to the Agreements.  (Doc. 52-1 at ¶¶ 5-6.)  The Robinson Report and the Hays and Woods Affidavits creates a genuine material factual dispute on the reasonably equivalent value issue.  A reasonable juror could find that Best Buy received a reasonably equivalent value for the 2010 and 2011 transfers, especially considering Best Buy made these transfers during a market that was "competitive and had adequate financial liquidity," but still suffered great financial hardship after these substantial transfers, or it could find to the contrary. (Doc. 43-10 at 2.)

It seems clear to the Court, that the issue of reasonably equivalent value will become a "battle of the experts," which is best fought out at trial before a jury.  If the question of reasonably equivalent value rests on the facts, as stated in *In re Chase & Sanborn Corp.* and *Kipperman*, then the numerous disputed issues of fact throughout this case cannot survive summary judgment on either side.  Thus, Innovate's Motion for Summary Judgment on all constructive fraudulent transfer claims is **DENIED.**

### C. Affirmative Defenses

Innovate specifically moves for summary judgment as a matter of law with respect to its good faith and *in pari delicto* affirmative defenses as to the actual and constructive fraudulent transfers claims.  As noted above, the good-faith defense found under O.C.G.A. § 18-2-78(a) is only applicable to claims of actual fraud under O.C.G.A. § 18-2-74(a)(1). Having found that Innovate is not entitled to summary judgment on the actual fraudulent transfer claims, Innovate is, however, entitled to seek to present this statutory affirmative defense.  However, in order to succeed under this O.C.G.A. § 18-2-78(a), Innovate must show that they both "took in good faith *and* for reasonably equivalent value . . . ."[15] (emphasis added).  Because there is a factual dispute on the issue of reasonably equivalent value, Innovate's summary judgment motion on this ground is **DENIED.**

---

[15] The statute's ". . . or against any subsequent transferee or oblige" is inapplicable here as this was a direct transfer between Best Buy and Innovate.

With respect to *in pari delicto*, the Court incorporates its analysis from Section I(B)(3) above.  Innovate moves for summary judgment on its *in pari delicto* defense to the extent that if Best Buy "did commit any wrongdoing against its creditor, TMG, it only did so at the behest and direction of that same creditor, TMG, and TMG's ultimate parent, TMT."  (Doc. 43-2 at 25.)  "[A]pplication of the *in pari delicto* doctrine in Georgia is a fact intensive inquiry done on a case by case basis."  *In re Friedman's Inc.*, 394 B.R. at 632.  While the facts are clear that Best Buy, through Bellville, entered into the 2010 and 2011 Agreements, there is still a genuine material fact question as to whether these transfers to Innovate were fraudulent transfers.  The Court has already decided that this is a question best answered by a jury, and thus, it cannot unequivocally say as a matter of law that TMG and Best Buy were *in pari delicto*, or equally at fault, in effectuating these allegedly fraudulent transfers.

The Court is also concerned with the equities surrounding this case and the possibility that an *in pari delicto* defense would prevent innocent third-party creditors from seeking recovery of their investment.  If applying this defense would result in the "protection [of] the alleged wrongdoers and the punishment of the innocent," the Court should not apply *in pari delicto*, especially on motion for summary judgment.  *Hays v. Paul, Hastings, Janofsky & Walker LLP*, No. Civ.A 106CV754-CAP, 2006 WL 4448809, at *10 (N.D. Ga. Sept. 14, 2006).  Therefore, Innovate's Motion for Summary Judgment on its *in pari delicto* defense must be **DENIED.**

### III.  Innovate's Motion to Amend and Motion for Oral Argument

Innovate moved to amend its motion for summary judgment on February 5, 2015 and attached the affidavit of Preston Cecil, Innovate's Vice President of Risk Management, Exhibit A entitled "Best Buy Purchase Stat v. Annual Vintages Summary," and Exhibit B entitled "Historical Identity of Sellers of Notes to Innovate."  (*See* Doc. 49.)  Finding that such an amendment would not prejudice either party, Innovate's Motion to Amend (Doc. 49) is **GRANTED.**  Although the Court has already decided that Innovate's Motion for Summary Judgment (Doc. 43) should be **DENIED**, in reaching that conclusion it fully considered the attached affidavit and exhibits.

On February 27, 2015, Innovate moved for oral arguments with respect to the instant cross motions for summary judgment pursuant to M.D. Ga. L.R. 7.5.  Through oral arguments, it was Innovate's intent to "provide an opportunity to the Court to probe the veracity of the claims and evidence at issue in this case."  (Doc. 54 at 3.)  However, the Court agrees with the Committee that the need for oral arguments on these fully briefed, well-supported cross-motions for summary judgment is unnecessary.  Having found above that the Committee's Motion for Summary Judgment (Doc. 44) should be **GRANTED-IN-PART** and **DENIED-IN-PART**, and Innovate's motion for Summary Judgment (Doc. 43) should be **DENIED**, Innovate's Motion for Oral Argument (Doc. 54) is **DENIED AS MOOT.**

## CONCLUSION

For the reasons stated above, the Committee's Motion for Summary Judgment (Doc. 44) is **GRANTED-IN-PART** and **DENIED-IN-PART**.  Accordingly, the Committee's Motion for Summary Judgment is **GRANTED** with respect to Innovate's affirmative defense of arm's length transfers made in the ordinary course of business or financial affairs, but **DENIED** with respect to the Committee's constructive fraudulent transfer claims and Innovate's good faith, *in pari delicto*, and setoff and recoupment affirmative defenses.  The Court accepted Innovate's release of the following affirmative defenses, which may not be later raised at trial: (1) failure to state a claim, (2) jury trial, (3) judicial and equitable estoppel, (4) release, (5) waiver, (6) lack of standing, (7) simultaneous representation, (8) equitable subordination, and (9) characterization.  (Doc. 51 at 24.)  Thus, the Committee's Motion for Summary Judgment on these released affirmative defenses is **DENIED AS MOOT.**

Innovate's Motion for Summary Judgment (Doc. 43) is **DENIED** with respect to the actual fraudulent transfer claims, constructive fraudulent transfer claims, and the good faith and *in pari delicto* affirmative defenses.  Accordingly, Innovate's Motion to Amend (Doc. 49) is **GRANTED**, and Innovate's Motion for Oral Argument (Doc. 54) is **DENIED AS MOOT.**

**SO ORDERED**, this 30th day of September, 2015.

/s/ W. Louis Sands
**W. LOUIS SANDS, SR. JUDGE**
**UNITED STATES DISTRICT COURT**